IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

AARON MURPHY,
Plaintiff,

v.                                                                Case No. 20–CV–00969–JPG

WEXFORD HEALTH SOURCES, INC.,
Defendant.

<u>**MEMORANDUM & ORDER**</u>

This is a medical-malpractice case. Before the Court are Defendant Wexford Health Sources, Inc.'s ("Wexford's") First Motion for Summary Judgment, (ECF No. 44), Second Motion for Summary Judgment, (ECF No. 60), and Motion to Exclude the Testimony of Plaintiff's Expert Witness, (ECF No. 57); and Plaintiff Aaron Murphy's Motion to Exclude or Limit Testimony of Ernest Jackson, (ECF No. 54), and Motion to Exclude Opinion Testimony of Dr. Kushner, (ECF No. 55). For the reasons below, the Court:

- **DENIES** Wexford's Motion to Exclude the Testimony of Plaintiff's Expert Witness;

- **DENIES** Murphy's Motion to Exclude Opinion Testimony of Dr. Kushner;

- **GRANTS** Murphy's Motion to Exclude or Limit Testimony of Ernest Jackson; and

- **DENIES** Wexford's motions for summary judgment.

## I.   PROCEDURAL & FACTUAL HISTORY

On Wednesday, May 4, 2016, Murphy—then an inmate at Robinson Correctional Center within this District—had a wisdom tooth pulled by a prison dentist. (Compl. at 2, ECF No. 1; Answer at 2; ECF No. 39). The dentist prescribed him a pain reliever to take after the procedure but not an antibiotic. (Murphy Dep. at 15, ECF No. 69-2).

The next night, Murphy was experiencing soreness and swelling; so he submitted a healthcare form requesting to be seen by medical staff in the morning. (*Id.* at 22–23). Although the prison physician, Dr. Shah, would not be on site until Monday, he was still available over the phone. (Shah Dep. at 7, ECF No. 61–1).

On Friday, May 6, Murphy was examined by Nurse Rice. (Rice Dep. at 12, ECF No. 61-6). Nurse Rice noted that Murphy was experiencing a soft-tissue infection and significant "softball size" swelling. (Progress Notes at 1, ECF No. 61-7). Nurse Rice spoke to Dr. Shah, the on-site physician and Wexford employee.[1] (Rice Dep. at 13). Dr. Shah was surprised to learn that the dentist did not prescribe Murphy an antibiotic to take after the tooth pull, so he prescribed a five-day course of penicillin. (Shah Dep. at 26). Dr. Shah believed that penicillin was "one of the most commonly chosen drugs by M.D.s for dental infection." (*Id.* at 21). But Dr. Shah only prescribed a five-day course (rather than ten) because the dentist would be available by then to evaluate Murphy himself. (*Id.* at 26).

At 1:00 a.m. on Saturday, Murphy returned to the healthcare unit, again complaining of swelling and difficulty swallowing. (Progress Notes at 3). He was told by medical staff to return later in the morning. (*Id.*). Dr. Shah, who did not work on the weekend, was not contacted. (Shah Dep. at 30–31). Even so, Dr. Shah testified that he did not believe he *should* have been contacted because it usually takes several days for penicillin to provide relief; and Murphy was not experiencing any symptoms of acute emergency like fever or shortness of breath. (*Id.* at 31).

Murphy was reexamined at 9:00 a.m. (Progress Notes at 5). Nurse Rice was unable to obtain a blood sample due to Murphy's history of intravenous drug abuse. (*Id.* at 6). This made it difficult for Dr. Shah to determine whether the infection was responding to the antibiotic. (Shah

---

[1] Wexford, Dr. Shah's employer, "provide[s] healthcare services to inmates at all the facilities manages by the Illinois Department of Corrections." *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019).

Dep. at 69–70). Nurse Rice then contacted Dr. Shah and notified him that Murphy's condition worsened. (Progress Notes at 6). Dr. Shah prescribed Solu-Medrol—a steroid injection—because he thought that the increased swelling was possibly an allergic reaction, and Solu-Medrol "helps the swelling and allergic reaction." (Shah Dep. at 36). In Dr. Shah's practice, Solu-Medrol "has always helped the bacteria to subside more along with the antibiotic." (*Id.* at 37–38). He also instructed Nurse Rice to reassess at 2:00 p.m. (Progress Notes at 7). Dr. Shah was not concerned that the antibiotic was not working, however, because it "just started yesterday": He did not think that Murphy needed emergency care at that time. (Shah Dep. at 38).

On Monday, May 9 at 7:20 a.m., Murphy revisited the healthcare unit and was examined by Dr. Shah for the first time in person. (Shah Dep. at 46). Murphy informed him that his throat was still swollen, making it difficult to eat; so Dr. Shah changed Murphy's course of treatment from penicillin to Rocephin—another antibiotic—"[b]ecause it apparently works faster." (*Id.* at 50). Murphy was then placed on 23-hour infirmary observation to "see if the treatment is helping or [the] condition is getting stable or worse." (*Id.* at 40). At the time, Dr. Shah did not believe that Murphy's condition had worsened because he "didn't see . . . high temperature or any shortness of breath or any respiratory difficulty." (*Id.* at 41). Yet he also did not believe that Murphy's condition was improving: The swelling had not subsided, and Dr. Shah observed that the infected area in Murphy's mouth was turning gray. (*Id.* at 52). That said, Murphy maintained normal vital signs. (*Id.* at 55).

Things changed around 5:30 p.m. on May 10, when Murphy experienced a 105-degree fever and was chilling visibly. (Progress Notes 17). Dr. Shah prescribed a pain reliever to reduce the fever and instructed Murphy to take a shower. (*Id.*). Murphy was reassessed three times throughout the evening; and by 11:15 p.m., his fever dropped to 98.5 degrees. (*Id.* at 18–19).

— 3 —

The next morning, on May 11, Murphy reported for the first time that "he heard some whistling." (Shah Dep. at 60). Dr. Shah became concerned that Murphy was experiencing respiratory difficulty, (*id.*), and he ordered that Murphy be immediately sent to the emergency room, (Progress Notes at 21).

Murphy was sent to Crawford Memorial Hospital for a CT scan and later arrived at Carle Hospital for treatment. (Bailey Dep. at 9, ECF No. 61-5). He was examined by Dr. Bailey, a Harvard-trained surgeon with a specialty in "diseases and diagnoses of the oral cavity and the head and neck." (*Id.* at 6). Dr. Bailey agreed that penicillin is commonly prescribed to treat post-surgical infections and that it is an appropriate part of treatment. (*Id.* at 58–59). But although swelling and discomfort after oral surgery tend to get worse two-to-three days after the operation, it tends to improve after that point. (*Id.* at 56). Dr. Bailey concluded that Murphy was experiencing Ludwig's angina: a very rare and advanced infection in the neck requiring urgent surgical treatment. (*Id.* at 15–16, 70). Dr. Bailey then conducted a three-part surgery that ultimately proved successful. (*Id.* at 40–42).

Murphy first sued in this Court in 2018. (*See* Am. Compl. at 1, *Murphy v. Wexford Health Sources, Inc.*, 18-CV-01077-JPG [*hereinafter* "*Murphy I*"], ECF No. 16). Murphy named both Wexford and Dr. Shah as defendants. (*Id.*). Subject-matter jurisdiction depended on Murphy's Eighth Amendment claim for deliberate indifference—the parties were not diverse. (*See id.*). So after the Court dismissed the Eighth Amendment claim with prejudice, (Mem. & Order at 1, *Murphy I*, ECF No. 62), it also elected not to exercise supplemental jurisdiction over the remaining state-law medical-malpractice claim, (Order at 1, *Murphy I*, ECF No. 67). The Court therefore dismissed the claim without prejudice and directed the Clerk of Court to enter judgment. (*Id.*).

Murphy then filed this suit in 2019, raising only the medical-malpractice claim against Wexford.[2] (*See* Civil Cover Sheet at 2, ECF No. 1). In brief, Murphy alleges that Dr. Shah's chosen course of treatment and the delay in sending him to the emergency room constitute medical malpractice under Illinois law. (*Id.* at 3–7).

Wexford moved for summary judgment on two grounds. First, it says that Murphy has not supplied the Court—in this action, at least—with the requisite medical affidavit required to sue under Illinois law. (Wexford's First Mot. for Summ. J. at 2–3). Second, it says that there is no genuine dispute of any material fact and that it is entitled to judgment as a matter of law. (Wexford's Second Mot. for Summ. J. at 2–3).

## II.   MOTIONS TO EXCLUDE

Murphy's claim largely relies on the testimony of Dr. Citronberg, an accomplished physician with decades of experience treating infectious diseases. (Citronberg's Op. at 4–6, ECF No. 69-1). He has not, however, worked in a prison setting. (*See id.* at 4–8).

With that in mind, Dr. Citronberg contends that Dr. Shah violated the standard of care in three ways: (1) he prescribed penicillin instead of a more appropriate antibiotic, such as amoxicillin; (2) he failed to transfer Murphy to the emergency room when it became apparent that he was not improving; and (3) he prescribed Solu-Medrol in an uncontrolled setting. (*Id.* at 2). Although Dr. Citronberg disagreed with Dr. Shah's choice of treatment, however, he agreed that Dr. Shah provided "what he thought was the right treatment" and did not "wholly disregard" Murphy's condition. (Citronberg Dep. at 10, ECF No. 61-2).

---

[2]  Subject-matter jurisdiction now exists under diversity of citizenship, 28 U.S.C. § 1332, given that Murphy is an Illinois citizen and Wexford is a Pennsylvania corporation with its principal place of business being Pennsylvania; and because the amount in controversy exceeds $75,000. (*See* Compl. at 1–2).

In response, Wexford proffered the testimony of Dr. George Kushner and Dr. Ernest Jackson. In Dr. Kushner's opinion, "[s]ynergistic steroid and antibiotic therapy is a commonly accepted therapy and was appropriate in this circumstance." (Kushner's Op. at 1, ECF No. 55-1). Dr. Jackson, a dentist, similarly concluded that Dr. Shah's decisions to prescribe penicillin and steroids were appropriate. (Jackson's Op. at 1, ECF No. 61-4). Dr. Jackson also suggested that, based on his "experience as a dentist in the correctional setting," "the care provided by Dr. Shah to Mr. Murphy was within the standard of care." (*Id.*).

Finally, in rebuttal, Dr. Citronberg again reiterated that "[t]he use of steroids for adjunctive treatment of Mr. Murphy's condition in the prison infirmary was not appropriate due to the increased risk for spread of infection." (Citronberg Rebuttal at 1, ECF No. 69-3). He also asserted that "[e]ven if there were an alternative explanation for the origin of the severe infection . . . , the management by Dr. Shah still should have dictated earlier transfer out of the prison . . . ." (*Id.*).

Both litigants moved to exclude each other's experts on the basis that they are unreliable and unqualified.

### A.  Legal Standard

Because subject-matter jurisdiction rests on diversity of citizenship, the Court will apply federal procedural law and state substantive law. *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 380 (7th Cir. 2001) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). The litigants agree that Illinois substantive law applies to Murphy's medical-malpractice claim. Thus to prevail, Murphy must first "prove the proper standard of care against which the defendant physician's conduct is measured . . . ." *Addison v. Whittenberg*, 529 N.E.2d 552, 556 (Ill. 1988).

"Whether an issue is relevant in a case is a question of substantive state law; [but] whether the specific evidence offered is relevant to resolving the issue is a procedural question governed by the Federal Rule of Evidence." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013). And "[u]nder the Federal Rules of Evidence, testimony is relevant as long as it 'has any tendency to make a fact more or less probable' than it would otherwise be." *Id.* (quoting Fed. R. Evid. 401); *see also* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993) (noting liberal relevance standard).

For expert testimony to be admissible, the proponent must also establish that the expert is qualified "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. In other words, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Id.* at 592–93. In other words, "[p]roposed testimony must be supported by appropriate validation," *id.* at 590, and not merely "connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "The focus, of course, should be on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

The Court's gatekeeping function "often must be exercised with special care." *Joiner*, 522 U.S. at 148 (Breyer, J., concurring). Expert testimony is admissible only if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

     (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Several considerations may bear on the inquiry including:

     (1)    whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;

     (2)    whether the technique or theory has been subject to peer review and publication;

     (3)    the known or potential rate of error of the technique or theory when applied;

     (4)    the existence and maintenance of standards and controls; and

     (5)    whether the technique or theory has been generally accepted in the scientific community.

*Id.* at advisory committee's note to 2000 amendment; *Daubert*, 509 U.S. at 593.

"The determination of whether a witness is qualified to testify as an expert lies within the sound discretion of the district court." *Chambers v. Ingram*, 858 F.2d 351, 356 (7th Cir. 1988) (citing *Dolan v. Galluzzo*, 396 N.E.2d 13, 16 (1979) ("[I]t lies within the sound discretion of the trial court to determine if the witness is qualified to testify as an expert regarding the standard of care.")). "A party challenging either the admission or exclusion of an expert" therefore "bears a heavy burden." *United States v. Tomasian*, 784 F.2d 782, 785 (7th Cir. 1986).

### B.  Law & Analysis

#### i.  Dr. Citronberg

Wexford contends that Dr. Citronberg's testimony should be excluded for two reasons. First, it argues that Dr. Citronberg "is unqualified to testify as an expert on the standard of care" because "he has no knowledge, training, or experience in front-line treatment of odontogenic

infections . . . ." (Wexford's Mot. to Exclude Dr. Citronberg at 2). More specifically, Wexford suggests that Dr. Citronberg is unqualified because although he is an "infectious disease physician [who] has treated patients in a hospital setting, he has never provided treatment to offenders in a correctional setting." (Wexford's Mem. in Supp. of Its Mot. to Exclude Dr. Citronberg at 4–5, ECF No. 58). Wexford further argues that Dr. Citronberg testimony should be excluded because he relies on mere speculation: He testified that "he would defer to a dentist or oral surgeon on key issues," so Wexford says that Dr. Citronberg's criticisms of Dr. Shah's choice of treatment are "baseless conclusions." (Wexford's Mot. to Exclude Dr. Citronberg at 2). The Court disagrees.

Under Illinois law, "those practicing the medical arts in the penitentiary are held to the **same standard of care** as those practicing in the communities of our State." *Moss v. Miller*, 625 N.E.2d 1044, 1051 (Ill. App. Ct. 1993) (emphasis added). "In determining the standard of care against which the defendant physician's alleged negligence is judged, Illinois courts have followed the 'similar locality' rule, which requires a physician to possess and to apply that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances." *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986). It follows that "an expert medical witness seeking to express an opinion in an affidavit as to the proper standards of diagnosis, care, and treatment that should have been followed in a particular case must lay a foundation which affirmatively establishes his qualifications and competency to testify. It must be established that the expert is a licensed member of the school of medicine about which he proposes to express an opinion, and the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Id.* at 872–73. "Once the former requirement has been satisfied, 'it lies within the sound discretion of the trial

court to determine if the witness is qualified [and competent] to [state his opinion] as an expert regarding the standard of care.' " *Id.* at 873 (alteration in original) (quoting *Dolan*, 396 N.E.2d at 16). "The weight to be given to the expert testimony in such cases is for the trier of fact." *Walksi v. Tiesenga*, 381 N.E.2d 279, 260 (Ill. 1978); *see also Borowski v. Von Solbrig*, 328 N.E.2d 301, 205 (Ill. 1975) ("As in other negligence cases the question of whether the doctor deviated from the standard of care and whether his conduct was a proximate cause of the plaintiff's injury are questions of fact for the jury."). The task of the trial judge, therefore, is to "look at each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010).

Here, Dr. Citronberg's nearly 30 years of experience as an infectious disease physician in a hospital setting gives him adequate experience to testify about the standard of care for treating an infectious disease in a prison. He has been an attending physician at Advocate Lutheran General Hospital in Park Ridge, Illinois since 1994, where he has served as the director of the Division of Infectious Diseases since 2004. (Citronberg's Op. at 4). At the same time, Dr. Citronberg has served as an attending physician at Presence Resurrection Medical Center in Chicago. (*Id.*). He has also been an expert witness in nearly two dozen lawsuits in this State, including one other in this District in 2017. (*Id.* at 3). He was also a volunteer attending physician at a clinic in Chicago for eight years, providing health care to indigent residents. (*Id.* at 5). In sum, Dr. Citronberg is, at the very least, familiar with the methods, procedures, and treatments ordinarily observed by other physicians in Dr. Shah's community of practice, Southern Illinois.

The Court therefore **DENIES** Wexford's Motion to Exclude the Testimony of Plaintiff's Expert Witness.

### ii.  Dr. Kushner

Murphy filed two *Daubert* motions of his own. First, he argues that Dr. Kushner's testimony—that it was appropriate for Dr. Shah to prescribe Murphy penicillin—is conclusory and should therefore be excluded as unreliable. (Murphy's Mot. to Exclude Dr. Kushner at 2). The Court disagrees.

Dr. Kushner testified that Dr. Shah's course of treatment fell within the standard of care:

> Mr. Murphy had his upper left wisdom tooth extracted on May 4, 2016. Facial swelling following such an extraction is a normal event. I tell patients the maximum swelling is 48 hours after such a procedure. Over the following week, Mr. Murphy's temperature hit 99.4 degrees, which is not considered febrile. It was proper for Dr. Shah to prescribe Mr. Murphy antibiotics in the form of oral Penicillin due to post-surgical inflammation and swelling
>
> Dr. Shah testified that he ordered Solumedrol, a steroid, to treat Mr. Murphy's swelling and due to the possibility of an allergic reaction. In this scenario, it was appropriate for Dr. Shah to utilize synergistic antibiotic and steroid therapy. Synergistic steroid and antibiotic therapy is a commonly accepted therapy and was appropriate in this circumstance.

(Kushner Op. at 1).

Contrary to Murphy's suggestion, Dr. Kushner's opinion stemmed from a review of the pleadings, Dr. Citronberg's report, deposition transcripts, and Murphy's medical and dental records—alongside his skill and training as a distinguished oral and maxillofacial surgeon and professor at the University of Louisville School of Dentistry. (*Id.* at 1, 4). Like Dr. Citronberg, Dr. Kushner too is qualified to testify: A jury can weigh their testimony.

The Court therefore **DENIES** Murphy's Motion to Exclude Opinion Testimony of Dr. Kushner.

— 11 —

### iii.  Dr. Jackson

Second, Murphy contends that Dr. Jackson, a dentist, is not qualified to testify as an expert about a doctor's standard of care. (Murphy's Mot. to Exclude Dr. Jackson at 1).

In *Dolan v. Galluzo*, the Illinois Supreme Court clarified that "a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school of medicine." 396 N.E.2d at 15 (cleaned up).

> The rationale general rule restricting expert testimony regarding the standard of care owed by a practitioner of a certain school of medicine is that there are different schools of medicine with varying tenets and practices, and that inequities would be occasioned by testing the care and skill of a practitioner of one school of medicine by the opinion of a practitioner of another school. **The practitioner of a particular school of medicine is entitled to have his conduct tested by the standards of his school**.

*Id.* at 16 (emphasis added) (cleaned up); *see, e.g.*, *Lange v. Kaveney*, No. 07-632-DHR, 2008 WL 5111257, at *2 (S.D. Ill. Dec. 4, 2008) (excluding a podiatrist's testimony about the standard of care of an orthopedic surgeon because they are from "different legislatively designated school[s] of medicine").

The Court agrees that Dr. Jackson, who focuses on general dentistry and forensic dentistry, is not qualified to testify about the standard of care of a physician or an oral surgeon. Under Illinois law, dentists and physicians are students of different schools of medicine; so their testimony is not interchangeable. *Compare* Illinois Dental Practice Act, 225 Ill. Comp. Stat. § 25/1 *et seq.*, *with* Medical Practice Act of 1987, 225 Ill. Comp. Stat. § 60/1 *et seq*. This is true even though Dr. Jackson, Chief of Dental Services for the Missouri Department of Corrections, is an otherwise immensely qualified practitioner.

The Court therefore **GRANTS** Murphy's Motion to Exclude Opinion Testimony of Dr. Kushner.

III.    MOTIONS FOR SUMMARY JUDGMENT

   A.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Rules of Civil Procedure therefore "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 322. So "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). That said, "[t]he evidence of the non-movant is to be believed[;] and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

   B.  Law & Analysis

      i.  First Motion for Summary Judgment

Wexford contends that it is entitled to judgment as a matter of law because, "[t]o date, [Murphy] has failed to submit the required [healthcare affidavit] to support his healing arts malpractice action under Illinois law." (Wexford's First Mot. for Summ. J. at 3). The Court disagrees.

Illinois law generally requires medical-malpractice plaintiffs to submit an affidavit prepared by a health professional who has "reviewed the facts of the case" and "reasonably believes . . . that there is a reasonable and meritorious cause for the filing" of a medical-malpractice suit. *See* 735 Ill. Comp. Stat. § 5/2-622(a)(1). In applying this requirement, "Illinois courts have announced that medical malpractice plaintiffs should be afforded every reasonable opportunity to establish their cases." *Buechel v. United States*, 646 F. Supp. 2d 1038, 1040 (S.D. Ill. 2009) (Gilbert, J.) (citing *Hansbrough v. Kosyak*, 490 N.E.2d 181, 188 (1986)). So "when the certificate was filed but failed in some technical or minor respect, sound discretion requires an opportunity to amend." *Sherrod v. Lingle*, 223 F.3d 605, 614 (7th Cir. 2000) (citing *Apa v. Rotman*, 680 N.E.2d 801, 804 (Ill. 1997)).

With that in mind, Wexford's reliance on the case *Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014), for the proposition that "dismissal is proper if plaintiff fails to attach the required affidavit and report" is inapt. (Wexford's Mem. in Supp. of Its First Mot. for Summ. J. at 4, ECF No. 45). True, the Seventh Circuit recognized that Illinois law requires the submission of a medical affidavit. *Hahn*, 762 F.3d at 633. But it also clarified that a failure to comply with the requirement is not grounds for dismissal with prejudice. *Id.* at 834. Rather, a district judge abuses his discretion if he fails "to permit a plaintiff to amend his complaint in order to comply with section 2-622 . . . ." *Id.* The court of appeals also stated that a district judge's "sound exercise of discretion" requires that leave to amend be freely given when there is "no specific finding that the failure to [comply with the affidavit requirement] was in bad faith or an attempt to delay litigation." *Id.* And five years later, the Seventh Circuit in *Young v. United States* similarly stated that "a complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622." 942 F.3d 349, 351 (7th Cir. 2019).

— 14 —

Here, Murphy *did* file the required affidavit—in the initial case, at least, which this Court dismissed without prejudice. (Am. Compl. at Ex. A, *Murphy I*, ECF No. 16). Murphy then re-filed the affidavit here as an attachment to his response to Wexford's First Motion for Summary Judgment. (Murphy's Resp. to First Mot. at Ex. A, ECF No. 47-1). The complaints in both cases involve the same medical-malpractice claim arising from the same facts. And "where a minor technical error is involved, permitting a plaintiff to amend more closely furthers the purpose of section 2-622 than dismissing with prejudice." *Thompson by Thompson v. Heydemann*, 596 N.E.2d 664, 667 (Ill. App. Ct. 1992). Thus the Court will consider the requirement satisfied given that (1) it must be liberally construed, (2) Murphy has since filed the affidavit, and (3) there is no indication that Murphy's failure to file the affidavit sooner was done in bad faith or an attempt to delay resolution of this case.

The Court therefore **DENIES** Wexford's First Motion for Summary Judgment.

### ii.  Second Motion for Summary Judgment

Wexford also argues that summary judgment is appropriate because "[t]he evidence in this case, including the deposition of [Murphy's] own expert witness, demonstrates that a reasonable jury could not find that Dr. Shah was negligent . . . ." (Wexford's Mem. in Supp. of Its Second Mot. for Summ. J. at 12). The Court disagrees.

"The elements of a cause of action for medical malpractice" under Illinois law "are well established." *See Addison v. Whittenberg*, 529 N.E.2d 552, 556 (Ill. 1988).

> To prevail, a malpractice plaintiff must prove the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. Because laypersons normally are not qualified to evaluate professional medical conduct, [the Illinois Supreme Court] has stated that a plaintiff generally must present expert testimony to establish the elements of the cause of action;

> exceptions to the requirement of expert testimony have been found in cases in which the treatment is so common, or the act so grossly negligent, that a layman would be able to make a proper evaluation of the challenged conduct in the light of his own fund of experience and knowledge.

*Id.* (internal citations and quotation marks omitted).

With that in mind, "[t]he central issue in a medical-malpractice action is the standard of care against which a doctor's negligence is judged." *Curi v. Murphy*, 852 N.E.2d 401, 410 (Ill. App. Ct. 2006).

> It is the plaintiff's burden to prove by a preponderance of the evidence that the defendant deviated from the standard of care. Of course, this requires proof of the applicable standard of care. A deviation from the standard of care constitutes professional negligence, which must be proved by expert testimony. **The question of whether a medical professional deviated from the standard of care is a question of fact for the jury**.

*Hardy v. Cordero*, 929 N.E.2d 22, 26 (Ill. App. Ct. 2010) (emphasis added); *see also Guo v. Kamal*, 155 N.E.3d 517, 623 (Ill. App. Ct. 2020) ("[T]he plaintiff bears the burden to present expert testimony that established the standard of care and that breach thereof was the proximate cause of the plaintiff's injury.").

Genuine disputes of material fact preclude summary judgment. For one, the litigants dispute whether Dr. Shah's performance fell below the standard of care. To be sure, little if anything suggests that Dr. Shah behaved recklessly or with indifference to Murphy's condition. But given the severity of Murphy's symptoms, a jury should decide whether the six days—from May 6 to 11—it took for Dr. Shah to send Murphy to the emergency room was negligent. Indeed, the litigants presented conflicting expert testimony from Dr. Citronberg and Dr. Kushner about the propriety of Dr. Shah's course of treatment. These are ultimately issues of credibility that a jury will have to weigh when deciding whether Dr. Shah deviated from the standard of care. A jury can

similarly assess the reasonableness of Dr. Shah's conduct given that Murphy's symptoms may not have arisen from the tooth pull but from a different source. Taken as a whole, the facts are not so one-sided as to justify taking this case from a jury.

The Court therefore **DENIES** Wexford's Second Motion for Summary Judgment.

## IV.    CONCLUSION

The Court:

- **DENIES** Wexford's Motion to Exclude the Testimony of Plaintiff's Expert Witness;

- **DENIES** Murphy's Motion to Exclude Opinion Testimony of Dr. Kushner;

- **GRANTS** Murphy's Motion to Exclude or Limit Testimony of Ernest Jackson; and

- **DENIES** Wexford's motions for summary judgment.

**IT IS SO ORDERED.**

**Dated: Tuesday, June 15, 2021**

**S/J. Phil Gilbert**
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**